UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>      Plaintiff,<br><br>      v.<br><br>MACK D. MURRELL,<br>DAVID A. TEEKELL, and<br>CHARLES W. ADAMS,<br><br>      Defendants,<br><br>RAYMOND JAMES FINANCIAL<br>SERVICES, INC.,<br><br>      Relief Defendant. | Civil Action No. |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows:

## SUMMARY OF THE ACTION

1.      This matter involves unlawful insider trading and tipping ahead of the July 10, 2008 public announcement that The Dow Chemical Company ("Dow") would acquire Rohm & Haas Co. ("Rohm"), by Dow's former Vice President of Information Systems, Mack D. Murrell ("Murrell"), Murrell's long-time friend, David Teekell ("Teekell"), and Teekell's broker, Charles W. Adams (collectively, the "Defendants").

2.      Murrell breached duties of trust and confidence that he owed to his then live-in girlfriend, now wife, Stacey A. Murrell ("Stacey") who was the administrative assistant to Dow's then Chief Financial Officer ("Chief Financial Officer"), by misappropriating material nonpublic information about the impending acquisition from Stacey.

3.      Murrell also breached his fiduciary duty and his duty of trust and confidence to his employer, Dow, not to disclose any material nonpublic information he learned regarding Dow.

4.      Murrell used the material nonpublic information obtained from Stacey and Dow to tip his close friend, Teekell.

5.      Teekell then tipped his broker and friend, Adams, who was a registered representative at Raymond James Financial Services, Inc. ("Raymond James" or "Relief Defendant"). Teekell and Adams bought Rohm securities, including common stock and options, in accounts they held at Raymond James, based on the illegal tip from Murrell.

6.      Adams also purchased Rohm stock in two discretionary customer accounts.

7.      The day before the public announcement of the acquisition, shares of Rohm stock closed at $44.83 per share. Following the acquisition announcement, on July 10, Rohm's share price closed at $73.62, a 64 percent increase.

8.      As a result of their unlawful trading, Teekell and Adams made significant profits from the purchases of Rohm securities. Teekell realized profits of $534,526; Adams realized profits of $64,450; and Adams' customers realized profits of $42,596. Adams also profited from commissions he received on the improper trades.

9.      Raymond James realized profits of $373,497 from Rohm options that Adams had purchased for Teekell as part of the fraudulent trading but later disavowed.

10.     In total, the Defendants and Relief Defendant realized ill-gotten gains in excess of $1,000,000 from their trading in Rohm securities and the commissions thereon.

11.     By knowingly and/or recklessly engaging in the conduct described in this Complaint, Defendants Murrell, Teekell, and Adams violated and, unless enjoined and

2

restrained, will continue to violate Section 10(b) of the Securities Exchange Act of 1934

("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## JURISDICTION AND VENUE

12.     The Commission brings this action pursuant to Sections 21(d) and 21A of the

Exchange Act [15 U.S.C. §§ 78u(d) and 78u-1] to enjoin such acts, practices, and courses of

business and to obtain disgorgement, prejudgment interest, civil money penalties, and such other

and further relief as the Court may deem just and appropriate.

13.     The Court has jurisdiction over this action pursuant to Sections 21(e), 21A, and

27 of the Exchange Act [15 U.S.C. §§ 78u(e), 78u-1, and 78aa].

14.     Venue in this district is proper pursuant to Sections 21A and 27 of the Exchange

Act [15 U.S.C. § 78aa].  Among other things, certain of the acts, practices, and courses of

business constituting the violations of the federal securities laws alleged herein occurred within

the Eastern District of Michigan.

15.     In connection with the conduct alleged in this Complaint, Murrell, Teekell, and

Adams made use of a means or instrumentality of interstate commerce, or of the mails, or of a

facility of a national securities exchange.

## DEFENDANTS

16.     **Mack D. Murrell,** age 53, lives in Saginaw, Michigan.  From about 2007 to

September 2011, Murrell was the Vice President, Information Systems for Dow, when he

relinquished his title and position to become Dow's Vice President, Diamond Systems.  In March

2013, Murrell resigned from Dow.  He is currently working as a consultant for the company.

17.     **David A. Teekell,** age 53, lives in Tomball, Texas.  He and Murrell have been

friends since high school.

3

18.     **Charles W. Adams**, age 59, lives in Conroe, Texas.  Adams is currently employed at a financial and investment advisory services firm that offers brokerage services through a broker-dealer registered with the Commission.  Adams is a registered representative, holding Series 4, 7, 24, 63, and 66 licenses.  From September 1996 through December 2011, Adams was a registered representative at Raymond James.  From December 2001 until December 2011, Adams was employed at a financial and investment advisory services firm that offered brokerage services through Raymond James.

## RELIEF DEFENDANT

19.     **Raymond James Financial Services, Inc.** is a St. Petersburg, Florida based broker-dealer and investment adviser registered with the Commission.  At all times relevant to this Complaint, Adams was a registered representative at Raymond James.

## RELATED PERSON AND ENITIES

20.     **Stacey A. Murrell,** age 48, lives in Saginaw, Michigan.  From 1989 until August 2012, when she retired, Stacey was employed at Dow as an administrative assistant.  From 2006 through December 2009, Stacey worked for Dow's then Chief Financial Officer.  Subsequently, she worked for Dow's current Chief Financial Officer.  Stacey and Murrell lived together beginning in 2006, and were married in May 2009.

21.     **Rohm & Haas Co.** was a publicly held company engaged in the creation and development of innovative technologies and solutions for the specialty materials industry with its headquarters in Philadelphia, Pennsylvania.  Before it was acquired by Dow on April 1, 2009, Rohm's stock was traded on the NYSE under the symbol "ROH."

22.     **The Dow Chemical Company**, headquartered in Midland, Michigan, provides a broad range of technology-based products and solutions through its portfolio of specialty

4

chemicals, advanced materials, agrosciences, and plastics businesses. Dow's shares are listed on the NYSE under the symbol "DOW."

**FACTS**

**I.     Dow's Acquisition Of Rohm And Stacey's Involvement**

23.     In early June 2008, Rohm executive management initiated discussions regarding a possible sale of the company with three possible buyers, including Dow. At a fairly early stage of the discussions, one of the potential buyers dropped out, leaving only Dow and the other potential buyer.

24.     Beginning in mid-June 2008, Rohm senior management conducted negotiations with Dow and Dow began conducting due diligence. On June 16, 2008, Dow indicated to Rohm a willingness to pay $74 per share of Rohm stock.

25.     Dow's Chief Financial Officer, who was also a member of Dow's Board of Directors, was intimately involved in analyzing and evaluating the possible acquisition of Rohm.

26.     Due to her position as the administrative assistant to Dow's Chief Financial Officer, Stacey had access on a real-time basis to information regarding Dow's impending acquisition of Rohm, including all information that the Chief Financial Officer, as a central figure in the transaction, had access to. In connection with performing her work duties, Stacey accessed this information.

27.     On June 26, 2008, Stacey and Dow's Chief Financial Officer each signed confidentiality agreements relating to their work on the proposed transaction. The confidentiality agreement stated that the proposed transaction was between Dow and Rohm and that its internal code name was project Ramses.

28.     On or about that same day, Stacey spoke with the Chief Financial Officer about

5

the potential acquisition. When she learned Dow might acquire Rohm, Stacey was concerned

that friends and colleagues at Dow might lose their jobs. From at least that date, Stacey was

aware that Rohm was the acquisition target of Dow and of the status and progress of the

negotiations.

29.     On Sunday, June 29, 2008, Dow senior executive management, including the

Chief Executive Officer ("Chief Executive Officer"), Chief Financial Officer, and others,

participated in a strategy meeting regarding the potential acquisition in a conference room in

Dow's New York office.

30.     The next day, Dow entered into a confidentiality agreement with Rohm, and Dow

and Rohm executive management met in New York City.

31.     On July 1, 2008, Dow senior management met with the company's financial and

legal advisors to discuss a proposed draft acquisition agreement received from Rohm.

32.     On July 2, 2008, Dow senior leadership, including the Chief Executive Officer,

Chief Financial Officer, and others, met at Dow's headquarters to discuss the potential

transaction.

33.     Around 10:14 am that day, an email notified the Chief Financial Officer and

others that Dow was going to have a special meeting of the Board of Directors that afternoon at

4:00 pm. (Except where otherwise stated, the times of day identified in this Complaint are

eastern time.)

34.     Between approximately 2:30 pm and 3:00 pm, in advance of the special meeting,

a slide presentation relating to the potential transaction and Dow's analysis of it that was to be

used during the meeting was circulated to members of the Board of Directors and others,

including Stacey.

6

35.    At approximately 4:00 pm on July 2, 2008, Dow held a special meeting of its Board of Directors to discuss the proposed transaction, including the status of negotiations. Members of Dow's executive team, including the Chief Executive Officer and Chief Financial Officer, who were both members of the Board, participated in the meeting in a board room in the executive suite in Dow's offices. Other members of the Board participated by telephone. Stacey's desk was in the executive suite, not far from the conference room where the Dow executives sat for the special meeting. During that special meeting, the Board voted to increase its cash offer for Rohm to a price of up to $78 per share and to obtain financing for the transaction.

36.    Between July 3, 2008 and July 7, 2008, Dow continued to work on the potential transaction. Meetings were held in person and by telephone involving Dow personnel and outside consultants and advisors. In addition, Dow exchanged drafts of the acquisition agreement with Rohm, and drafts of other relevant documents, such as a draft voting agreement. The Chief Financial Officer was personally involved in and/or kept advised of these developments.

37.    On July 7, 2008, Rohm received an offer from Dow of $76 per share and from the other potential buyer of $75 per share.

38.    On July 8, 2008, Dow's Board of Directors met. The potential acquisition was discussed, including bidding strategy and financing.

39.    On July 9, 2008, Rohm instructed both Dow and the other potential buyer to improve their proposals. That day, Dow submitted a revised proposal to Rohm of $78 per share in cash.

40.    In the morning of July 10, 2008, Rohm and Dow each executed the definitive

7

acquisition agreement.

41.     At approximately 7:09 am on July 10, 2008, Rohm and Dow issued a joint press release announcing the proposed acquisition, in which Dow would acquire all outstanding shares of Rohm common stock for $78 per share.

42.     Before the public announcement, the acquisition discussions between the two companies were nonpublic and neither company had announced any ongoing negotiations.

43.     On July 9, 2008, the day before the public announcement of the acquisition, the price of Rohm common stock closed at $44.83 per share.  Following the acquisition announcement, on July 10, Rohm's share price closed at $73.62, a 64 percent increase.

## II.     The Relationships Among The Relevant Persons

### A.     *Murrell And Stacey Shared A Relationship Of Trust And Confidence*

44.     Murrell and Stacey lived together beginning in 2006 and were married in May 2009.  In early July 2008, they purchased their home in Saginaw, Michigan.

45.     During the relevant time period, Murrell was the Vice President, Information Systems for Dow and Stacey was the administrative assistant to Dow's Chief Financial Officer.

46.     Murrell and Stacey had a relationship of trust and confidence.  They shared confidences regarding such matters as their respective children, ongoing relationships with their former spouses, and their finances.  They had a history of keeping secrets from other people.

47.     Stacey was expected to be on call at all times to the Chief Financial Officer.  She frequently worked from home in the evenings and on weekends using her Dow laptop and Blackberry, and often took calls from the Chief Financial Officer at home.  Besides reviewing her own emails on her Blackberry while at home, Stacey was responsible for monitoring the Chief Financial Officer's emails using her laptop.

48.     Stacey trusted Murrell.  When working from home, she did not take precautions to hide her work from him.

49.     The period of time during which the Rohm acquisition was being negotiated was a particularly busy time for Stacey given the Chief Financial Officer's travel and meeting schedule.

50.     At times, Stacey shared with Murrell the reasons why she was required to work late or had to cancel previously scheduled plans.

### B.     Murrell And Teekell Had Been Close Friends Since High School

51.     Murrell and Teekell were high school friends in Houston, Texas.  Following high school, Murrell and Teekell remained friends and saw each other often while living in the Houston area.

52.     After graduating from the University of Houston, Murrell began working for Dow in Houston in May 1980.

53.     In August 1993, Murrell moved to Midland, Michigan as part of his increasing responsibilities at Dow.  Murrell and Teekell continued to maintain their friendship and saw each other every few years during Murrell's visits to Houston and once, the Teekells traveled to Midland.

54.     On occasion, Murrell and Teekell spoke by telephone or emailed each other.

55.     In January 2006, Murrell, Teekell, and three Dow employees formed a limited partnership that purchased an undeveloped parcel of land in South Padre Island, Texas.

### C.     Teekell Was A Long-time Customer Of Adams

56.     Teekell had been a customer of Adams since 1996. During 2008, Teekell and Adams generally met once a month for lunch and Teekell at times stopped by Adams' office,

9

which was located a few miles from Teekell's home.

### III.   Murrell Obtained Material Nonpublic Information Regarding Dow's Acquisition Of Rohm

57.   On or before July 3, 2008, Murrell obtained from Stacey material nonpublic information regarding Dow's potential acquisition of Rohm.

58.   Murrell owed both Dow and Stacey a duty to keep that material nonpublic information confidential.

59.   On July 2, 2008, Stacey informed Murrell via email that Dow's Chief Executive Officer had pulled everyone into a meeting and a special meeting/call with the Board of Directors was going to be arranged for either that day or the next day, writing: "[The Chief Financial Officer] and I talked, he is really hoping to get out of here today. REALLY hoping. BUT, he said he just doesn't know. [Dow's Chief Executive Officer] is here and has pulled everyone in (the last 20 min). [The Chief Financial Officer] said he'd rather do the Board call from up-north if he can (tomorrow AM). If that is the case, I won't need to be here – [another Dow employee] can handle. If he leaves today, I'm right behind him..........stay tuned hon."

60.   Stacey and Murrell had further communications during the day by phone, including calls before and after the start of the 4:00 pm special meeting of the Board. The special Board meeting ended at approximately 5:20 pm. About 10 minutes after it ended, Stacey called Murrell's cell phone.

### IV.   Murrell Breached His Duty And Tipped Teekell The Material Nonpublic Information Regarding Dow's Acquisition Of Rohm, And Teekell Tipped Adams

61.   On July 3, 2008, the morning after the special Board meeting, at approximately 8:36 am, Murrell emailed Teekell, with whom he had not communicated for about three weeks, stating in part: "Ive lost your phone numbers. . Would you mind sending them to me or giving me a call. Would like to talk briefly today."

62.     Murrell believed that the Rohm acquisition would be good for Dow. Between approximately 8:45 am and 9:10 am, Murrell took $70,464 out of two funds in his 401(k) and invested that amount in the Dow stock fund in his 401(k). As a result of those trades, Murrell's 401(k) consisted of almost 68 percent of the Dow stock fund. This was the first sale and reinvestment Murrell had done in the account in 2008.

63.     At around 10:48 am, Teekell replied to Murrell's email and provided his cell phone number.

64.     At about 11:24 am, Murrell called Teekell. The call lasted approximately 13 minutes. Right after that call ended, Murrell again called Teekell; that call lasted about 2 minutes.

65.     As soon as Teekell got off the phone with Murrell, he tried calling Adams at his work and then on Adams' cell phone. Around 11:41 am, Adams returned Teekell's call; that call lasted about 7 minutes.

66.     A few minutes later, around 11:54 am, Adams called Raymond James' general number to speak with Raymond James' Chief Investment Strategist concerning Dow's financial ability to do an acquisition. That call lasted about 7 minutes.

67.     After that call ended, around 12:01 pm, Adams called Teekell; that call lasted about 4 minutes. Immediately following the call with Adams, Teekell called Murrell. That call lasted about 6 minutes.

68.     After the fraudulent trading that ensued was discovered, Adams told Raymond James' compliance personnel that Teekell had asked him about buying Rohm securities and that Teekell had said he had a friend in the chemical industry. Adams also stated that, when he spoke with Raymond James' Chief Investment Strategist prior to trading, he asked him about Dow and

11

its ability to do a significant acquisition.

69.     The Commission staff subpoenaed Murrell and Teekell to testify under oath during the investigation in this matter.  Both Murrell and Teekell asserted their Fifth Amendment privilege against self-incrimination and refused to answer questions.

## V.     The Next Business Day, Teekell And Adams Began Purchasing Rohm Securities On The Basis Of Material Nonpublic Information

70.     Over the holiday weekend, July 5 and 6, 2008, Murrell and Teekell had several more communications via phone and text message.  On Sunday, July 6, 2008, Teekell and Adams had two calls, one of which lasted 17 minutes.

71.     On Monday, July 7, 2008, the next business day after the material nonpublic information regarding the potential acquisition of Rohm by Dow was provided by Murrell to Teekell and Teekell to Adams, Teekell and Adams took steps to profit on that inside information.

72.     At approximately 10:46 am, Adams purchased 1,000 shares of Rohm stock in Teekell's SEP IRA account at a cost of about $45,000.

73.     Around mid-day, Teekell visited Adams at his office.  At that time, Teekell deposited a $200,000 check into an individual account he held at Raymond James.  Although the account had been opened in May 2006, prior to this deposit, the account held no funds or securities.

74.     In addition, at that time, Teekell executed an options agreement for the individual account, which was not previously approved for options trading.

75.     Teekell and Adams took these steps even though a joint account that Teekell had with his wife already held assets and had been approved for options trading in 2005.  Although it was approved for options trading, the Teekells had not traded any options in that account.

76.     Although Teekell was a client of Adams for more than a decade, Teekell never

traded options of any kind through Adams before buying options in Rohm on July 9, 2008.

77. On July 8, 2008, Adams called Teekell at approximately 12:21 pm. That call lasted about 3 minutes.

78. That same day, Adams concluded that in order to purchase options in Teekell's individual account, the account required margin approval. Adams therefore had his assistant fax a rush margin approval request to Raymond James.

## VI. Murrell Calls Teekell From Halfway Around The Globe And Teekell And Adams Continue Their Improper Trading

79. Beginning on Sunday, July 6, 2008, Murrell traveled to India for work. On July 8, 2008, he flew from India to the Middle East, specifically Dubai, United Arab Emirates. After arriving in Dubai, around 1:08 pm eastern time (9:08 pm local Dubai time), Murrell called Stacey at work. That call lasted about 10 minutes. About three hours later, around 4:00 pm eastern time (12:00 am Dubai time), Murrell called Stacey at work again. That call also lasted about 10 minutes. About twenty-five minutes after that call ended, around 4:42 pm eastern time (12:42 am Dubai time), Murrell called Teekell twice. The first call lasted about 15 minutes. After it ended, Murrell called Teekell again and that call lasted about 3 minutes.

80. The next morning, July 9—the day before the acquisition of Rohm was publicly announced—Adams and Teekell continued their improper trading. Instead of buying Rohm stock, Teekell and Adams bought call option contracts. Each call option contract enables the buyer of the option contract to require the seller of the option contract to sell 100 shares of the underlying stock to the buyer at a specified price per share, called the strike price, within a specified period of time. Typically, when an investor purchases a call option contract, the investor is anticipating that the price of the underlying stock is going to go up at least a certain amount.

13

81.     It was Adams' idea to buy option contracts. And Adams understood that if an investor knew that a company was going to be acquired, buying option contracts would be the best way to maximize the investor's return on the investment based on that inside information.

82.     At around 9:26 am, Adams purchased 200 contracts of Rohm August 2008 call options with a strike price of $50 per share in Teekell's individual account at a price of $0.75 per option, for a total cost of $15,000. (The cost of the purchase, exclusive of commissions and fees, is calculated by multiplying the price per option by 100 and multiplying that number by the number of option contracts, here: $0.75 x 100 x 200 = $15,000). This purchase accounted for 78.43 percent of the publicly traded volume for this series of options on July 9, 2008.

83.     For these options to have been profitable, the price of Rohm stock had to increase by more than 10 percent over a short time period. If not, the investment would have been lost.

84.     At approximately 9:33 am, Adams purchased 200 contracts of Rohm January 2009 call options with a strike price of $50 per share in Teekell's individual account at a price of $2.85 per option, for a total cost of $57,000. This purchase accounted for 61.54 percent of the publicly traded volume for this series of options on July 9, 2008.

85.     Around that same time, Adams purchased the same two series of Rohm call options in a joint account he had with his wife, purchasing 20 contracts of Rohm August 2008 call options and 10 contracts of Rohm January 2009 call options, for a total cost of $4,350. A portion of these options were purchased on "margin", which means that Adams borrowed money to make the purchase.

86.     Adams' purchases of August and January Rohm call option contracts accounted for 7.84 and 3.08 percent of the publicly traded options volume for these series on July 9, 2008, respectively.

14

87.     Combined, Adams' and Teekell's purchases of the Rohm August 2008 call option contracts accounted for 86.27 percent of the publicly traded options volume for that series on July 9, 2008.  Their combined purchase of the Rohm January 2009 call option contracts accounted for 64.62 percent of the publicly traded options volume for that series on that day.

88.     At approximately 9:45 am, Adams called Teekell.  That called lasted about 8 minutes.

89.     Between approximately 10:09 am and 10:27 am, Adams also purchased Rohm stock in two customer accounts in which he had discretionary authority.  He purchased 500 shares in an account held by one customer, and 1,000 shares in an account of another customer.

90.     Around 11:13 am, Teekell called Adams.  That call lasted approximately 5 minutes.

91.     At approximately 12:12 pm, Adams called Teekell.  That call lasted approximately 14 minutes.

## VII.  Although Murrell Remained In The Middle East, He And Teekell Stayed In Contact With Each Other

92.     Also on July 9, 2008, after Adams purchased the Rohm call option contracts for Teekell, spending about $72,000 of the $200,000 Teekell deposited in his account, Teekell emailed Murrell, writing in part: "I will be working on my thesis in CA.  So far I've been able to do about ½ of it.  Hopefully will get a chance to work more towards the goal as circumstances allow.  Well have a good day.  Hope to talk to ya soon."

93.     Murrell responded to Teekell's email, writing in part: "Hope the thesis goes well[.]  Take care."

94.     After several calls with Adams, which lasted about 20 minutes combined, and just a few hours after his initial email to Murrell that day, Teekell emailed Murrell, writing: "Mack,

15

since you expressed an interest in my thesis, thought I'd let you know that I'm backing off the aggressive schedule.  Too much considering all things.  Sometimes you just have to admit limitations.  Ha!  Later, dude."

95.     After that email, Teekell did not buy any more Rohm securities.

96.     Around 2:55 pm that day (nearly 11:00 pm Dubai time), Murrell called Teekell. That call lasted about 26 minutes.

## VIII.   Teekell And Adams Attempted To Conceal Their Rohm Trading

### A.     Teekell And Adams Attempted To Conceal Their Wrongdoing With Other Trades

97.     On July 9, 2008, Teekell and Adams purchased call option contracts in other securities in an effort to camouflage their fraud.

98.     Between approximately 11:38 am and 1:12 pm, call option contracts in IBM, Cisco, and Bank of America were purchased in Teekell's account.  Adams also purchased Cisco call option contracts in his account, using margin to do so.  But, unlike their purchases in the Rohm call option contracts, none of these other call option contracts expired in August.  Also, neither Teekell nor Adams bought any stock in any of these companies at that time.  And while Teekell spent approximately $115,000 on Rohm stock and call option contracts, he spent less than half that amount on the call option contracts in the other three companies combined.

### B.     Teekell And Adams Attempted To Conceal Their Fraud By Trying To Sell Some Of The Rohm Securities They Purchased Before The Public Announcement

99.     In addition to trying to conceal their fraud through the purchase of call option contracts in other companies, Teekell and Adams tried to conceal their fraud by attempting to sell some of Teekell's Rohm call option contracts and all of Adams' Rohm call option contracts.

100.     Around 1:00 pm on July 9, 2008, Adams entered an order to sell 180 of Teekell's 200 contracts of Rohm January 2009 call options.  He placed an order to sell these options at

16

$3.00 per option, $0.15 per option more than Teekell had paid for them that day. However, that order was not filled.

101.    That night, around 9:00 pm, Adams called Teekell. The call lasted about 12 minutes. At around 9:30 pm, Adams placed a market order to sell all 200 of Teekell's call option contracts for the Rohm January 2009 call options. Around the same time, Adams placed a market order to sell all of his own Rohm call option contracts. Those orders could not be executed until the market opened the next morning.

### C.    The Morning Of The Public Announcement, Adams Continued His Efforts To Conceal Their Fraud And Persuaded Raymond James To Cancel Teekell's Trade That Adams Had Placed The Night Before And Change Teekell's Earlier Purchase Of Rohm January Options

102.    Around 7:00 am on July 10, 2008, two hours before the market opened, Dow and Rohm issued a joint press release publicly announcing the acquisition.

103.    After learning of the announcement, Adams placed a series of calls to both Raymond James and Teekell. Between approximately 7:18 am and 8:16 am, Adams placed more than 10 calls to Teekell and more than 10 calls to Raymond James. At around 8:34 am, a Raymond James compliance officer returned Adams' call. That call lasted approximately 9 minutes.

104.    During his call with the Raymond James compliance officer, Adams claimed that he had made an error entering the purchase of 200 contracts of Rohm January 2009 call options for Teekell and that it was only supposed to be 20 contracts. Adams also stated that he had placed an order to sell 180 of the contracts during the day on July 9 before the market closed and that order was not filled. Adams stated further that he placed an order to sell all 200 contracts of the Rohm January 2009 call options the prior evening. Adams wanted to cancel that order and then change the original buy order to only 20 contracts of the Rohm January 2009 call options.

17

Adams offered no explanation for why, if he had erroneously entered an order to purchase 200 contracts rather than 20 contracts, that he tried to sell the entire 200 contracts of Rohm January 2009 call options.

105.    Raymond James agreed to cancel the order to sell all 200 contracts of Teekell's Rohm January 2009 call options, and prior to the market opening, Raymond James cancelled that order.

106.    At around 8:45 am, Adams reached Teekell by phone.  That call lasted almost 30 minutes.

107.    Subsequently, at approximately 9:15 am, two Raymond James compliance officers called Adams regarding the alleged error.  That call lasted about 7 minutes.

108.    After that call, Adams called Teekell again.

109.    About a minute later, Raymond James called Adams.  That call lasted about 7 minutes.

110.    Around 9:30 am, Adams called Teekell yet again.  That call lasted about 11 minutes.

111.    At approximately 9:53 am, per Adams' request, Raymond James entered the trades necessary to change the original purchase in Teekell's account.  After these trades were entered, Teekell held 20 contracts of Rohm January 2009 call options and Raymond James held 180 Rohm January 2009 call options.

### D.    *During His Investigative Testimony, Adams Attempted To Conceal His Conduct*

112.    Raymond James' policy provides that any trade error by a registered representative should be immediately reported to the appropriate trading desk upon recognition. During his testimony in the Commission's investigation, Adams acknowledged that trade errors

should be reported immediately to the appropriate trade desk and that registered representatives are not allowed to try to change trades with additional trades.

113.   During the Commission's investigation, while testifying under oath, Adams again claimed that his purchase of the 200 contracts of Rohm January call options in Teekell's account on July 9, 2008 was an error and that it should have been 20 contracts of that option series.

114.   Adams testified further that he did not realize that 200 contracts of Rohm January 2009 call options were purchased until after the market had closed that day. Adams stated that when he realized his error, he called Teekell, who declined to accept the error. Adams testified that he called Raymond James but was told that the trade could not be changed until the next day. Adams testified further that he did not conduct any further activity in Teekell's account until he called Raymond James the next morning to change the trade.

115.   The trade was not an error, but part of Adams and Teekell's efforts to profit on the inside information provided by Murrell. Contrary to his testimony, Adams knew by at least 1:00 pm on July 9—three hours before the market closed—that he had purchased 200 contracts of Rohm January call options for Teekell. But he did not call Raymond James to cancel that trade because the trade was not a mistake. Moreover, calling Raymond James would have alerted the company that Adams' client was trading significant amounts of Rohm call options. Instead, in an effort to conceal their fraudulent conduct, Adams placed the order to sell 180 of Teekell's 200 contracts of Rohm January call options. However, because they entered the order to sell at a price above the market price, the order was not filled. Then, contrary to his testimony, Adams entered a trade the evening of July 9 to sell all 200 of Teekell's Rohm January 2009 call option contracts at the market price. He also entered an order to sell all of his own Rohm call option contracts at the market price.

116.    Those orders to sell were not the result of an "error." They were attempts by Adams to conceal his and Teekell's illegal conduct.

## IX.    Teekell, Adams, And Raymond James Sell
Their Rohm Securities Realizing Profits Of $1,015,069

117.    On July 10, 2008, after Raymond James changed the trades in Teekell's account as requested by Adams, Raymond James sold the 180 contracts of Rohm January 2009 call options it had kept, netting profits of $373,497.

118.    That day, Adams sold Teekell's 200 contracts of Rohm August 2008 call options. On July 11, 2008, Adams sold Teekell's 20 contracts of Rohm January 2009 call options. Adams sold Teekell's 1,000 shares of Rohm stock on August 11, 2008. In total, Teekell's ill-gotten gains were $534,526.

119.    Adams' orders to sell the Rohm August 2008 and January 2009 call option contracts in his joint account, which he had placed alongside the order to sell the 200 contracts of Rohm January 2009 call options in Teekell's account in the evening on July 9, were executed after market open on July 10, following the acquisition announcement. Those sales resulted in ill-gotten gains of $64,450 for Adams.

120.    In addition, on July 10, Adams sold the Rohm stock in the two discretionary customer accounts for a total profit of $42,596.

121.    Adams also realized ill-gotten gains through the commissions he received for the Teekell transactions and those of his other customers on their purchases and sales of Rohm securities.

## X.    Murrell, Teekell, And Adams Violated The Federal Securities Laws

122.    Stacey knew that Dow was trying to acquire Rohm and was aware of the ongoing confidential negotiations surrounding the impending acquisition of Rohm by Dow. She knew

20

that she possessed material nonpublic information regarding the impending acquisition.

123.    The confidential information regarding the acquisition of Rohm by Dow that

Murrell obtained from Stacey and Dow was material and nonpublic. A reasonable investor

would have viewed that information as important to his or her investment decision.

124.    Murrell knew, or was reckless in not knowing, that the information he obtained

relating to the acquisition of Rohm by Dow was material and nonpublic. Among other things, as

the Vice President, Information Systems for Dow, Murrell knew, or was reckless in not knowing,

that the information he received relating to the impending acquisition belonged to Dow.

125.    Murrell had a duty to maintain the confidentiality of the information.

126.    At all relevant times, Murrell and Stacey had a relationship of trust and

confidence. They had a history, pattern, and practice of sharing confidences.

127.    Stacey disclosed the material nonpublic information to Murrell in the context of

their relationship of trust and confidence and expected that Murrell would maintain the

confidentiality of that information.

128.    At all relevant times, Murrell knew or reasonably should have known that Stacey

had shared the material nonpublic information with him with the expectation and understanding

that it would be maintained in confidence.

129.    In whatever manner Murrell acquired the information from Stacey, Murrell knew

that it was material nonpublic information. In addition, Murrell knew that the information

belonged to Dow. Murrell also knew that pursuant to his employment relationship with Dow and

Dow's policies and procedures, he owed a fiduciary duty and a duty of trust and confidence to

Dow to keep such information confidential.

130.    In breach of his duty of trust and confidence to Stacey and/or Dow, Murrell

21

misappropriated the material nonpublic information regarding the acquisition of Rohm by Dow and tipped material nonpublic information regarding the impending acquisition to his friend Teekell.

131.    Murrell tipped material nonpublic information about the acquisition of Rohm by Dow to Teekell, knowing he would trade on the basis of that information, or recklessly indifferent to whether he would trade, and with the expectation of receiving a benefit.

132.    Teekell knew, or should have known, that the material nonpublic information that he received from Murrell had been obtained in a breach of a fiduciary duty or obligation arising from a similar relationship of trust and confidence.

133.    On the basis of the material nonpublic information tipped by Murrell, Teekell purchased Rohm securities.

134.    Teekell tipped material nonpublic information regarding the acquisition of Rohm by Dow to Adams, knowing he would trade on the basis of that information, or recklessly indifferent to whether he would trade, and with the expectation of receiving a benefit.

135.    Adams, a registered representative with over 25 years of experience, knew that it was a violation of the securities laws to purchase securities while in possession of material nonpublic information.

136.    Adams knew, or should have known, that the material nonpublic information that he received from Teekell had been obtained in a breach of a fiduciary duty or obligation arising from a similar relationship of trust and confidence.

137.    On the basis of the material nonpublic information tipped by Teekell, Adams purchased Rohm securities in his own account as well as two discretionary customer accounts.

## CLAIMS FOR RELIEF

## FIRST CLAIM

## Violations Of Section 10(b) Of The Exchange Act And Rule 10b-5 Thereunder

### (Against All Defendants)

138.   The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 137, inclusive, as if they were fully set forth herein.

139.   The information concerning the impending acquisition of Rohm by Dow that Murrell obtained from Stacey and Dow was material and nonpublic.

140.   At all times relevant to the Complaint, Defendants Murrell, Teekell, and Adams acted knowingly and/or recklessly.

141.   By engaging in the conduct described above, the Defendants, directly or indirectly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange:

     a.    employed devices, schemes or artifices to defraud;

     b.    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

     c.    engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

142.   By engaging in the foregoing conduct, Defendants violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5

thereunder [17 C.F.R.§ 240.10b-5].

## SECOND CLAIM

### Claim With Respect To Relief Defendant

143.    The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 142, inclusive, as if they were fully set forth herein.

144.    Relief Defendant Raymond James received gains from a trade based on material nonpublic information.  It has no legitimate claim to those gains.

145.    Relief Defendant obtained the gains described above as part, and in furtherance of, the securities law violations alleged above, under circumstances in which it is not just, equitable, or conscionable for it to retain the funds.

146.    By reason of the foregoing, Relief Defendant has been unjustly enriched and must disgorge the amount of its ill-gotten gains.

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court enter Final Judgments:

## I.

Permanently restraining and enjoining Defendants and their agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

**II.**

Ordering Defendants to disgorge all unlawful trading profits and other ill-gotten gains, including but not limited to commissions, received as a result of the conduct alleged in the Complaint, together with prejudgment interest thereon, including, as to each of the Defendants, the trading profits and other ill-gotten gains, including but not limited to commissions, of their direct and downstream tippees, and prejudgment interest thereon;

**III.**

Ordering Defendants to pay civil penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1];

**IV.**

Permanently barring Murrell from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] that is required to file reports under Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

**V.**

Ordering the Relief Defendant to disgorge all trading profits and other ill-gotten gains to which it does not have a legitimate claim that it received as a result of the conduct alleged in the Complaint, together with prejudgment interest thereon; and

**VI.**

Granting such other and further relief as this Court may deem just, equitable, and necessary.

Respectfully submitted,

_____
Daniel M. Hawke
Elaine C. Greenberg
Kingdon Kase
G. Jeffrey Boujoukos
John V. Donnelly III   (PA Bar No. 93846)
Suzanne C. Abt

Attorneys for Plaintiff:

SECURITIES AND EXCHANGE COMMISSION
Philadelphia Regional Office
701 Market Street, Suite 2000
Philadelphia, PA 19106
Telephone: (215) 597-3100
Email: donnellyj@sec.gov

LOCAL COUNSEL

Barbara L. McQuade
United States Attorney
Peter A. Caplan
Assistant U.S. Attorney
211 W. Fort Street, Ste. 2001
Detroit, MI 48226
(313) 226-9784
P30643
Email:  peter.caplan@usdoj.gov

July 1, 2013